BONNETT, FAIRBOURN, FRIEDMAN
 & BALINT, P.C.
Andrew S. Friedman (AZ Bar. 005425)
Guy A. Hansen (AZ Bar. 013549)
2901 North Central Avenue, Suite 1000
Phoenix, Arizona  85012
afriedman@bffb.com
ghanson@bffb.com
Telephone:  (602) 274-1100
Facsimile:   (602) 274-1199

Daniel F. Goldstein
Mehgan Sidhu
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 1700
Baltimore, MD 21202
(410)962-1030
(410)385-0869 (fax)
dfg@browngold.com
ms@browngold.com

Counsel for Plaintiffs
[Additional Counsel Appear on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| The NATIONAL FEDERATION OF THE BLIND, The AMERICAN COUNCIL OF THE BLIND, and DARRELL SHANDROW,<br><br>Plaintiffs,<br><br>vs.<br><br>The ARIZONA BOARD OF REGENTS and ARIZONA STATE UNIVERSITY,<br><br>Defendants | Case No:<br><br><br>**COMPLAINT** |

Plaintiffs National Federation of the Blind ("NFB"), American Council of the

Blind ("ACB") and Darrell Shandrow, by and through their attorneys, hereby submit their

Complaint against the Arizona Board of Regents ("Regents") and Arizona State

University ("ASU") for violations of section 504 of the Rehabilitation Act of 1973 (the

"Rehabilitation Act") and Title II of the Americans with Disabilities Act ("ADA").

## INTRODUCTION

1.      Over 35 years after the passage of the Rehabilitation Act directed institutions like ASU  to refrain from discriminating on the basis of disability in the operation of programs and activities, Defendants  have adopted cutting edge technology - - the Kindle DX -- to provide textbooks to ASU students in electronic format even though the Kindle technology is gratuitously inaccessible to its blind students.  They have done so as part of a pilot program designed to tout the Kindle DX's use in colleges and universities, which threatens to set an example of inaccessibility for other institutions to follow.  Because, unlike ink on paper, electronic books are not inherently visual or aural and can therefore offer equal access to blind and sighted students and faculty alike, it is especially unfortunate that Defendants have abrogated their statutory responsibility to ensure that ASU adopts fully accessible electronic textbook technology.

## JURISDICTION

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 and pursuant to its supplemental jurisdiction over claims brought under the laws of the State of Arizona.

3.      Venue is proper within this District pursuant to 28 U.S.C. § 1391.

## PARTIES

4.      The NFB is a non-profit corporation duly organized under the laws of the District of Columbia with its principal place of business in Baltimore, Maryland.  It has affiliates in all 50 states, Washington, DC and Puerto Rico.  The vast majority of the Federation's approximately 50,000 members are blind persons and therefore individuals

with disabilities under the Rehabilitation Act and the ADA.

5.      The ACB is a non-profit corporation duly organized under the laws of the District of Columbia with its principal place of business in Arlington, Virginia.  The ACB has 51 state and regional affiliates and 20 national special interest and professional affiliates.  The Council's membership numbers in the tens of thousands, the vast majority of whom are blind persons and therefore individuals with disabilities under the Rehabilitation Act and the ADA.

6.      Plaintiff Darrell Shandrow is a student at the Walter Cronkite School of Journalism and Mass Communication at ASU.  He is blind and is thus substantially impaired in the major life activity of seeing.  Plaintiff Shandrow is a member of the ACB.

7.      Defendant Arizona Board of Regents was created pursuant to statute to have jurisdiction and control over public universities in Arizona including Arizona State University.  Defendant Regents is thus a public entity as that term is used in Title II of the ADA.

8.      Defendant Arizona State University is a public university with campuses in several locations around the state of Arizona.  ASU is thus a public entity as that term is used in Title II of the ADA.

9.      Defendants receive federal financial assistance as that term is used in 29 U.S.C. § 794.

## FACTS

10.      An electronic book ("e-book") is a digital file consisting of the content of a book formatted to be read on a dedicated device, a personal computer, or a smart phone. The e-book itself consists of digital code recorded on an electronically-readable medium

and is not inherently legible, audible, or tactile.  Rather, an e-book is read using a device that renders the code visually, aurally, or tactilely.

11.     Blind students read e-books on computers equipped with text-to-speech software or refreshable Braille displays or on portable readers developed for blind students, like the Victor Reader Stream.

12.     The Kindle is a dedicated device for reading e-books.  For print readers, it renders the e-book into visible text on electronic paper to simulate the experience of reading a print book.

13.     The most recent versions of the Kindle -- the Kindle 2 and the Kindle DX -- also have a text-to-speech ("TTS") function that renders the e-book into audible speech; thus, if the Kindle menus and controls were accessible, blind students would have access to the same content as sighted students through the same device.

14.     The Kindle DX is approximately ten inches high, seven inches wide, and one-third of an inch thick.  It weighs just over a pound and can hold up to 3,500 books.

15.     When e-books are displayed as visible text, they are shown on the Kindle DX's 9.7 inch diagonal screen.  This screen auto-rotates to permit users to view text in either portrait or landscape mode.

16.     The Kindle DX has an internal wireless modem.  Thus, when a Kindle user decides to purchase an e-book, he or she is able to download the book directly to the Kindle, without use of a personal computer or other intermediate device.

17.     The Kindle DX does more than simply download, store, and retrieve books. It has a keyboard that permits users to take notes.

18.     The Kindle DX has functions permitting users to highlight text, look up the

definition of words, and search across a given library.

19.     Although the Kindle DX renders text audibly through its TTS function, the menus (for selecting a book, activating features, configuring device settings, etc.) are on-screen only, with no audio option, making the Kindle inaccessible to blind users.  If a student cannot see the screen, she cannot know which book she has selected, what the configuring settings are or how to change them, or how to navigate the on-screen menu. Similarly, without audible screen navigation, the Kindle DX web browser, Kindle Store, and other features will simply not work for blind and low vision students.

20.     Because of the larger display, Amazon is promoting the use of the Kindle DX in the textbook market.  Publishers representing sixty percent of the textbook market have agreed to make their textbooks available through the Kindle Store.

21.     In May, 2009, Amazon announced that six post-secondary schools around the country would launch trial programs to provide Kindle DXs to their students in the fall of 2009.  In addition to providing instant access to textbooks, the Kindle would permit students to take advantage of its other features -- such as highlighting, note-taking, and dictionary and Wikipedia referencing -- and, in Amazon's words, would permit them to "carry all of their books in a single light-weight device."

22.     ASU is one of the six institutions participating in the trial program.

23.     One of the goals of Defendants' Kindle pilot program is to explore how to "accelerate the adoption of electronic textbooks."  To advance the role of e-books in the classroom without regard to accessibility has the potential to exclude blind students from this important new technology for the foreseeable future.

24.     As part of Defendants' pilot program, "a group of students enrolled in this

fall's Human Event course will receive their textbooks not as bound books but on a brand new Kindle DX instead.  The Human Event is a two-semester course . . . that covers a wide range of material from about 50 different sources."

25.    Students in selected other courses will also receive Kindle DXs.

26.    Defendants have trumpeted that "Kindle delivered e-books would provide students with a significant cost savings and provide them an additional flexible learning tool. In addition to cutting textbook costs and reducing the weight in students' backpacks, digital textbooks are available for download wirelessly and reduce the amount of paper used to print and distribute textbooks."

27.    Defendants have further noted that, "[e]lectronic texts provide the capabilities that today's students have come to expect - they are searchable, flexible, easy to annotate, and cost less than traditional texts."

28.    Because the Kindle is not accessible to blind students, they will not be able to use it or to have the opportunity to enjoy its many advantages, including the ability to download books almost instantly, to take notes on the Kindle, to look up words on the Kindle and to carry all of their textbooks -- at least for the participating classes -- in one small device.

29.    Because the Kindle DX is inaccessible, blind students in classes to which the Kindle is distributed will be required to obtain accessible textbooks through some other method.  This does not include the option of reading a Kindle book on another device because (1) Kindle books are encrypted with Digital Rights Management software that prevents it from being read on another device; (2) e-book reading machines designed for the blind do not have wireless browsers permitting download of e-books; and (3)

certain functions available on the Kindle, like the ability to look up words, are not available on other reading devices.

30.     The other methods by which blind students can obtain e-books are far more burdensome, costly, time-consuming, and inflexible than the access provided by the Kindle DX and often result in text that is not only far less useable than the Kindle DX, but that often contains scanning errors that make it far more difficult to use even than traditional print textbooks.  One of the methods is to request an electronic file from the publisher, but this can take months and often results in the provision of an inaccessible electronic file, like an untagged PDF.  Another method is for the blind student to purchase a print textbook and take it to the Disability Resource Center, where the cover will be ripped off and the book scanned and run through OCR (optical character recognition) software to produce an e-book.  These are generally without the structural data necessary for proper reading order (if the book has columns, sidebars or footnotes) or to ensure navigability (distinguishing page 9, chapter 9, figure 9 and footnote 9).  Another method is to obtain an audio-taped version of the book from an organization such as Reading for the Blind and Dyslexic or from Disability Resource Center volunteers.  Such audio-taped books are often not available and, when they are available, are difficult to use because they are read by volunteers who often have no understanding of the subject matter, because their clarity depends on the speed, accent, and speaking style of the reader, because they do not allow searching, and because they do not provide spelling of terms.

31.     ASU's own Disability Resource Center warns blind students that, "[t]extbook/print conversion is a time-intensive process, especially for technical subject

matter, and can require up to four months . . . to complete. To facilitate the availability of these accommodations from the first day of class, [blind] students must enroll in classes during Priority Enrollment, provide qualifying disability documentation to the Disability Resource Center (DRC), meet the accommodation request deadlines, and follow specified procedures."

32.     ASU's DRC "strongly recommends" that students with disabilities "become familiar" with methods of obtaining accessible materials on their own "[i]n case materials are not available on the requested delivery date."

33.     On information and belief, ASU's DRC often provides accessible materials late and the materials it provides are often full of errors, lack some structural data, or are in a PDF format that is difficult to use.  In recognition of the potential for delays, DRC recommends students who need accessible materials "to discuss the possibility of a reduced reading load through course balancing with their Disability Access Consultant."

34.     A representative of the Reading Rights Coalition ("RRC"), which includes Plaintiffs NFB and ACB, wrote to the president of ASU, Michael M. Crow, on May 7, 2009, to explain why adoption of the Kindle DX without assuring accessibility for blind and other low-vision students was a violation of the Rehabilitation Act and the ADA.

35.     After several attempts to engage with the General Counsel for ASU in addressing the inequitable position of blind ASU students, the RRC informed ASU that it was requesting that ASU not go forward with the pilot program until Amazon makes the Kindle DX accessible to blind students.

36.     ASU refused to curtail the pilot program even though the Kindle DXs that it plans to use are inaccessible to blind students.

37.     Defendants intentionally refused to ensure the accessibility of ASU's service, program, or activity of mobile access to e-books.

38.     At the very least, Defendants were aware that their refusal to ensure the accessibility of ASU's service, program, or activity of mobile access to e-books made it substantially likely that they would harm federally-protected rights.  Despite this knowledge -- and the knowledge that this would exclude blind students from this service, program, or activity -- they continued to refuse to provide such access.

39.     Defendants' actions have caused and continue to cause distinct, palpable, and perceptible injury to the NFB and ACB.

40.     The NFB's mission is to promote the general welfare of blind people by (1) assisting blind people in their efforts to integrate themselves into society on terms of equality and independence; and (2) removing barriers and changing social attitudes, stereotypes and mistaken beliefs sighted and blind people hold concerning the limitations created by blindness that result in the denial of opportunity to blind people in virtually every sphere of life.

41.     The NFB improves the lives of blind people through advocacy, education, research, technology, and programs encouraging independence and self-confidence.  It also serves as a collective and representative voice on behalf of blind Americans and their families.

42.     The NFB's mission also includes working to ensure that blind university students have an equal opportunity to benefit from the education they receive, and to participate in and benefit from the programs and activities of their schools without discrimination on the basis of disability.

43.     The NFB furthers this mission in many ways, including giving blind high school and college students leadership training and scholarships and founding three national centers for acquiring blindness skills.  It also does so by urging state and federal legislation to get blind college students equal access to textbooks and by working with state legislatures to enact laws requiring equal access to electronic material.

44.     The ACB's mission is to improve the well-being of all blind and visually impaired people by:  serving as a representative national organization of blind people; elevating the social, economic and cultural levels of blind people; improving educational and rehabilitation facilities and opportunities; cooperating with the public and private institutions and organizations concerned with blind services; encouraging and assisting all blind persons to develop their abilities and conducting a public education program to promote greater understanding of blindness and the capabilities of blind people.

45.     The ACB's mission also includes working to ensure that blind university students have an equal opportunity to benefit from the education they receive, and to participate in and benefit from the programs and activities of their schools without discrimination on the basis of disability.

46.     The ACB furthers this mission in many ways, including providing toll-free information and referral on all aspects of blindness, providing scholarship assistance to blind/visually impaired post-secondary students; and engaging in public education and awareness training.

47.     Defendants' discrimination has frustrated the NFB's and ACB's missions and caused it to divert resources to identify and counteract Defendants' discriminatory practices.

48.     Defendants' discrimination has been and continues to be a barrier to the full participation of blind students and therefore, frustrates the NFB's and ACB's missions to achieve full inclusion for blind people.  Among other things, these organizations' missions are frustrated by Defendants' discrimination because it takes away the opportunity for blind students to compete on an equal basis.

49.     Defendants' discrimination has required and continues to require the NFB and ACB to make a greater effort -- and to allocate resources -- to educate the public that such discrimination is wrong and otherwise to counteract the adverse impact of such discrimination.  This perceptibly impairs the NFB's and ACB's counseling, advocacy, educational, and training missions.

50.     Defendants' discrimination sends the message that it is acceptable for a college of the stature of ASU to adopt inaccessible technology and other services, programs or activities that exclude and discriminate against blind students.  This frustrates the NFB's and ACB's missions and makes it more difficult for the NFB and ACB to convince schools and other entities with services, programs or activities involving mobile access to e-books that those services, programs and activities may not discriminate.

51.     The NFB and ACB have also devoted and continue to devote resources -- including but not limited to those devoted to the present lawsuit -- to identifying and counteracting Defendants' discrimination and its effects in the community.

52.     The actions that the NFB has taken to identify and counteract Defendants' discrimination have diverted its resources from other important programs.  For example (without limitation) the NFB's Access Technology Team has taken time away from its

training, product evaluation, outreach, and counseling activities to investigate and attempt to counter the effects of Defendants' discrimination and NFB staff have conducted additional outreach and counseling to address Defendants' discrimination.

53. The actions that the ACB has taken to identify and counteract Defendants' discrimination have diverted its resources from other important programs. For example (without limitation) the ACB President, Executive Director and other staff members have taken time away from their activities to conduct additional outreach and counseling to address Defendants' discrimination.

54. All of the activities undertaken to identify and counteract the effects of Defendants' discrimination have caused economic losses to the NFB and ACB in the form of staff pay, attorney and consultant fees, and/or other funds spent on those activities.

55. The NFB's and ACB's injuries -- including, without limitation, those described herein -- are traceable to Defendants' discriminatory conduct alleged in this Complaint and will be redressed by the relief requested in it

56. NFB and ACB members include blind or visually impaired high school and college students who are eligible to apply to ASU and would be harmed by ASU's discriminatory practices.

57. NFB and ACB members include current blind or visually-impaired ASU students who are deterred from enrolling in classes or who have unequal opportunities to benefit from classes in which the Kindle DX will be offered and are otherwise suffering discrimination in other services, programs and/or activities of ASU.

58. The interests the NFB and ACB seek to protect in this litigation are

germane to their purposes, as more fully described above.

59.     Because the NFB and ACB seek to ensure that any e-book-reading technology is accessible to all students, including blind and visually-impaired students, neither the claims asserted herein nor the relief requested requires the participation of individual members.

60.     Plaintiff Shandrow's injuries from Defendants' discrimination include the harm -- including dignitary harm -- of observing the university he attends undertake a widely-promoted new program that excludes him and others who share his disability. Defendants' actions also harm Plaintiff Shandrow because they stigmatize him and others who share his disability.

## FIRST CLAIM FOR RELIEF

(By all Plaintiffs for violation of section 504 of the Rehabilitation Act of 1973)

61.     Plaintiffs reallege and incorporate by reference the allegations in the remainder of this Complaint as if fully set forth herein.

62.     Defendants receive federal financial assistance as that term is used in 29 U.S.C. § 794.

63.     The activities described above, including but not limited to providing the Kindle to students and making textbooks available through the Kindle are programs and/or activities of Defendants.

64.     The Kindle is not accessible to blind students including Plaintiff Shandrow.

65.     As such, Defendants have violated the Rehabilitation Act by excluding blind students from participation in, denying them the benefits of, and/or subjecting them to discrimination under the programs and/or activities of Defendants through actions that

include but are not limited to the discriminatory conduct more fully described above.

66.    With respect to the discriminatory conduct described in greater detail above, Defendants acted intentionally or with reckless or callous indifference to the federally protected rights of others and/or with deliberate indifference to the strong likelihood that its acts would likely result in a violation of federally protected rights.

67.    Defendants' discrimination has harmed and will continue to harm Plaintiffs NFB, ACB and Shandrow as more fully described above.  Plaintiffs are thus persons aggrieved by Defendants' discriminatory acts and failures to act.

## SECOND CLAIM FOR RELIEF

(By all Plaintiffs for violation of Title II of the ADA)

68.    Plaintiffs reallege and incorporate by reference the allegations in the remainder of this Complaint as if fully set forth herein.

69.    Defendants are public entities as that term is used in Title II of the ADA, 42 U.S.C. § 12132.

70.    The activities described above, including but not limited to providing the Kindle  to students and making textbooks available throught the Kindle  are services, programs and/or activities of Defendants.

71.    The Kindle is not accessible to blind students including Plaintiff Shandrow.

72.    As such, Defendants have violated Title II of the ADA by excluding blind students from participation in, denying them the benefits of, and/or subjecting them to discrimination under the services, programs and/or activities of Defendants through actions that include but are not limited to the discriminatory conduct more fully described above.

73.     With respect to the discriminatory conduct described in greater detail above, Defendants acted intentionally or with reckless or callous indifference to the federally protected rights of others and/or with deliberate indifference to the strong likelihood that its acts would likely result in a violation of federally protected rights.

74.     Defendants' discrimination has harmed and will continue to harm Plaintiffs NFB, ACB and Shandrow as more fully described above.  Plaintiffs are thus persons aggrieved by Defendants' discriminatory acts and failures to act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray:

1.     That this Court assume jurisdiction;

2.     That this Court declare Defendants' conduct, as described more fully above, to be in violation of Title II of the ADA and section 504 of the Rehabilitation Act;

3.     That this Court issue an injunction ordering Defendants to comply with Title II of the ADA and section 504 of the Rehabilitation Act with respect to the provision of e-textbook and e-reader services, programs, and activities;

4.     That this Court award Plaintiffs reasonable attorneys' fees and costs; and

5.     That this Court award such additional or alternative relief as may be just, proper and equitable.

RESPECTFULLY SUBMITTED this 25th day of June, 2009.

BONNETT,FAIRBOURN, FRIEDMAN
 & BALINT, P.C.

/s/Andrew S. Friedman
Andrew S. Friedman (AZ Bar. 005425)
Guy A. Hanson (AZ Bar. 013549)
2901 North Central Avenue, Suite 1000
Phoenix, AZ  85012-3311

afriedman@bffb.com
ghanson@bffb.com
Telephone: (602) 274-1100
Facsimile: (602) 274-1199

*OF COUNSEL, Pro Hac Vice* Admission
Pending:
Daniel F. Goldstein
Mehgan Sidhu
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 1700
Baltimore, MD 21202
Telephone: (410) 962-1030
Facsimile:  (410) 385-0869
dfg@browngold.com
ms@browngold.com

Amy Robertson
FOX & ROBERTSON, P.C.
104 Broadway, Suite 400
Denver, CO 80203
TTY:  (877) -595-9706
Telephone: (303) 595-9700
Facsimile:  (303).595.9705
ARob@foxrob.com

Eve Hill
1667 K St. NW, Suite 640
Washington, DC 20006
ehill@law.syr.edu
Telephone: (202) 296-2044
Facsimile:  (202) 296-2047

Attorneys for Plaintiffs